United States District Court
Southern District of Texas

**ENTERED**

August 04, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SAHIBZADI NAFEES KISHWAR, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-15-2728 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | |

### MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary Judgment and Memorandum in Support thereof (Document No. 14, 15), Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 16), Defendant's Motion for Summary Judgment (Document No. 12) and Memorandum in Support thereof (Document No.13) and Plaintiff's Response to Defendant's Motion for Summary Judgment (Document No.17). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 12) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No.14) is DENIED, and the decision of the Commissioner is AFFIRMED.

### I. Introduction

Plaintiff, Sahibzadi Nafees Kishwar, ("Kishwar") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on November 18, 2015.  (Document No. 10).

Commissioner of Social Security Administration ("Commissioner") denying her application for disability benefits ("DIB") and social security benefits ("SSI"). Kishwar argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, D'Lisa Simmons, committed errors of law when she found that Kishwar was not disabled. Kishwar argues that she has been disabled since December 31, 2007, due to a Chronic Neck and Back pain due to injury, Osteoarthritis in her left elbow, Osteoporosis, Type II Diabetes, Diabetic Peripheral Neuropathy, Depression, Carpal Tunnel Syndrome, Hypertension, Fibromyalgia, and Plantar Fasciitis. In a disability report that Kishwar completed near the time she filed for benefits, she stated she could not work because of pain in her neck and back, along with limited mobility in her left hand. In a function report that Kishwar completed near the time she filed for benefits, she elaborated that the primary problem that precluded her from working: "I am unable to lift heavy or anything more than 2-3 lbs… [because of] chronic back & neck pain. I have stenosis of spine and cannot stand for more than [ten] minutes and walk more than [ten] minutes." (Tr. 279). Kishwar seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative, remanding her claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Kishwar was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II. Administrative Proceedings

On October 15, 2013, Kishwar filed for disability insurance benefits ("DIB") and Supplemental Security Income Benefits ("SSI") claiming that she had been disabled since December 31, 2007, due to: Chronic Neck and Back pain, Osteoarthritis in her left elbow, Osteoporosis, Type II Diabetes, Diabetic Peripheral Neuropathy, Depression, Carpal Tunnel Syndrome, Hypertension, and Plantar Fasciitis. (Tr. 222-227, 228-236). The Social Security Administration denied her applications at the initial and reconsideration stages. (Tr. 78-89, 104-118). Kishwar then requested a hearing before an ALJ on May 29, 2014. (Tr. 161-162). The Social Security administration granted

her request, and the ALJ held a hearing on January 21, 2015. (Tr. 30-77). On March 10, 2015, the ALJ issued her decision finding Kishwar not disabled. (Tr. 11-24).

Kishwar sought review by the Appeals Council of the ALJ's adverse decision. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest; or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. On June 8, 2015, the Appeals council denied Kishwar's request for review stating they had found "no reason under our rules to review the ALJ decision." (Tr. 1-3). Kishwar filed her appeal of the ALJ's decision on September 17, 2015. The Commissioner filed a Motion for Summary Judgement (Document No. 12), to which the Plaintiff filed a Response. (Document No. 17). Likewise, Plaintiff has filed a Motion for Summary Judgement (Document No. 14), to which the Defendant has filed a Response. (Document No. 16). This appeal is now ripe for ruling.

### III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits, is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d

3

1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues *de novo*, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C.  § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the

immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1. If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2. If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;
>
> 3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
>
> 4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in her March 10, 2015, decision, that Kishwar was not disabled. In particular, the ALJ determined that Kishwar had not engaged in substantial gainful activity since December 31, 2007, (step one). That Kishwar had several medically determinable and severe impairments including: status post back injury with resulting chronic back and neck radicular

5

pain, degenerative disc disease of the cervical and lumbar spine with right-sided cervical radiculopathy, osteoarthritis in the left elbow, rotator cuff tendonitis, bilateral carpal tunnel syndrome, fibromyalgia, pain disorder, and depression and anxiety related to her general condition, non-severe diabetes mellitus, hypertension, vitamin B-12 deficiency, knee pain, plantar fasciitis, prescription narcotic dependence, were non severe impairments, (step two). However, the ALJ found that the above impairments either singly or in combination did not meet or equal a listed impairment in Appendix 1 of the regulations, (step three). The ALJ further determined, that Kishwar has the residual functional capacity ("RFC") to: lift, carry, push, or pull 20 pounds, occasionally and 10 pounds, frequently; sit 6 hours in an 8-hour workday with normal breaks and sit/stand option every 30 minutes; stand 6 hours in an 8-hour workday with normal breaks and a sit/stand option every 30 minutes[2]. The work was also limited to only occasional reaching, gross handling, and fine fingering with the non-dominant left upper extremity, and a restriction on the complexity of tasks to within three or four instructions in a supervised, low stress environment. The ALJ determined that based on Kishwar's RFC, her age, education, and the testimony of a vocational expert, she could still perform her previous work as a cashier (step four). The ALJ further found, in the alternative, that Kishwar could also perform work as a companion, an appointment clerk, or a receptionist and was not disabled within the meaning of the Act (step five). As a result, the Court must determine whether substantial evidence supports the ALJ's step four and, in the alternative, step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

---

[2] "Occasionally" means that the activity or condition exists from very little up to 1/3 of the time, "frequently" means the activity or condition exists from 1/3 to 2/3 of the time, and "constantly" means the activity or condition exists 2/3 or more of the time. *See, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles,* at Appendix C (U.S. Department of Labor, Employment and Training Administration 1993).

## V. Discussion

### A. Objective Medical Evidence

The medical records show that by October of 2013 Ms. Kishwar had been diagnosed and treated for several different types of injury or illness including: chronic back pain, chronic neck pain, osteoarthritis in the left elbow, osteoporosis, Type II Diabetes, diabetic peripheral neuropathy, carpal tunnel syndrome, hypertension, depression, and plantar fasciitis (Tr. 222-236, 247).

Beginning in 2007, Kishwar received treatment from Dr. Elizabeth Polacheck in Greenfield, Wisconsin. The records indicate Kishwar received treatment for "low back and left shoulder pain" from a 2007 work related injury, and for Type II Diabetes. (Tr. 832). In May of 2008, Kishwar was first diagnosed with degeneration of the spine, which was believed to be the cause of her neck and back pain. (Tr. 830-31). During this visit, Kishwar was prescribed pain medication, and also given restrictions on returning to work in which she would gradually work up to her normal hours. (Tr. 833). Subsequent records from Dr. Polacheck's office revealed that Kishwar followed up with her several times and there was overall improvement. (Tr. 810-34). However, Kishwar's complaint of pain continued throughout treatment under Dr. Polacheck. During Kishwar's final examination of record by Dr. Polacheck in 2012, Polacheck noted Kishwar's "gait and station were normal without [any] device" but exhibited "pain with lumbar extension" and limited range of motion in her shoulder. (Tr. 811-13).

In 2011, Kishwar moved from Wisconsin to Texas, and began receiving treatment from Dr. Giang Nguyen in September. (Tr. 688). During the initial visit with Dr. Nguyen, the records note that Kishwar continued to suffer from "tenderness [in] the mid back up to neck, arms/hands: [with a] muscle strength of 3/5 in both hands," Hypertension, and Type II Diabetes without complications. (Tr. 690). Dr. Nguyen proscribed Hydrocodone, Lancets, and Insulin, as well as ordering an MRI be done on Kishwar's back and neck. (Tr. 692). The MRI results showed mild mid spondylosis, but not any other abnormalities. (Tr. 678-698). Finally, at the end of 2011,

7

Kishwar saw Dr. Nguyen complaining of complications of her diabetes. (Tr. 669-72) Dr. Nguyen's records note that Kishwar was "adherent >75% with [her] use of medication," and also presented with "pain when touching anywhere on her body" despite the physical exam showing no abnormalities or muscle weaknesses. (Tr. 672).

In January of 2012, Kishwar was referred to Dr. Geoffrey Zubay of Mischer Neuroscience TW for continued treatment. (Tr. 530). During his initial assessment Dr. Zubay noted that while Kishwar complained of "subjective pain and weakness," her physical exam showed her gait to be normal, her spine to have "minimal tenderness on palpation," and "no focal findings" to prove serious back issues. (Tr. 530-32). Dr. Zubay followed up this initial examination with an MRI, to compare these results with remote images of Kishwar's spine. (Tr. 533). This report indicated "a broad base protrusion" was noted in L4-L5, an annular tear in in C3-C4, and mild stenosis in C5-C6. (Tr. 534-536).

In May of 2012, Kishwar went to a follow up exam after the MRI with Dr. Zubay. The records indicate that she complained of widespread pain including citing "Extreme" pain in her arms, back, legs, neck, and chest. (Tr. 538). Dr. Zubay's physical exam showed "no pain on palpation," worst case "4+/5 strength" in her extremities, and a normal gait with no abnormalities. (Tr. 540). The final diagnosis after the MRI was "Degenerative Joint Disease" and prescribed a facet injection and epidural injection. (Tr. 541)

In June of 2012, Dr. Zubay suggested, after thorough examination and exhaustive treatments, that Kishwar undergo a "two level anterior cervical fusion from C4-C6." (Tr. 547). On July 23, 2012 the procedure was performed without any complications. (Tr. 554-60). Two weeks later, Kishwar went to a follow up appointment with Dr. Zubay and was reported to have "substantially improved since surgery," including resolving radicular arm pain and no abnormalities during the physical exam. (Tr. 562-64). In another follow up in September, Dr. Zubay described Kishwar as "markedly improved… [with her] bilateral shoulder pain resolved, and adequate strength [in her] physical exam." (Tr. 568-570).

8

In early 2013, Kishwar began receiving treatment from Dr. Shaun Weaver of the UT Physicians practice, in Houston, TX. (Tr. 614). Dr. Weaver treated Kishwar for pain she was experiencing in her left elbow beginning in February. During the initial exam, Dr. Weaver noted there was restricted range of motion, and an X-Ray revealed a fracture that was about 2.5 centimeters. (Tr. 611, 615). Dr. Weaver also evaluated Kishwar's right hand during this visit, during which he found joint swelling but no other issues. (Tr. 614-16). In March, Kishwar returned to Dr. Zubay complaining again of neck pain. (Tr. 575). Dr. Zubay ordered another MRI to determine whether Kishwar had developed osteoarthritis, or possibly pseudoarthrosis. (Tr. 577) The MRI results turned up negative for either as the technicians found "no gross bony abnormalities" and "minimal incorporation of bone graft material". (Tr. 580).  Also, in March, Dr. Weaver ordered that Kishwar begin to receive physical therapy at Memorial Herman Sports Medicine and Rehabilitation center for the injury to her elbow and lower back. (Tr. 604). After several months of physical therapy, Kishwar self-reported that there had been "25% improvement" and this was also noted in the physical performed by Dr. Weaver. (Tr. 588-89).

In April, Kishwar received treatment from Dr. Luis Schaffer for her Type II Diabetes, simultaneously with her treatments from Dr. Zubay and Dr. Weaver. (Tr. 638, 580, 620). Over the course of 2013, Kishwar saw Dr. Schaffer several times during which he described her hypertension and Diabetes as "controlled." (Tr. 634-37). The only variation in this diagnosis came in August when Kishwar was diagnosed with Osteoporosis. (Tr. 632-33)

On November 24, Kishwar went to the Emergency Room ("ER") at Memorial Herman complaining of a headache and blood pressure issues. (Tr. 622). While the doctors ruled out any sickness or injury, the ER also noted in its report that there was "full [range of motion]" in Kishwar's neck, along with no abnormalities in her back or extremities. (Tr. 622-23). Finally, after running some tests the ER concluded that her pain was caused by radiculopathy, but could not find any areas of the back that would indicate the source of the pain. (Tr. 623).

In December of 2013, Kishwar also began receiving treatment for depression and PTSD

from Dr. Barbara Hall. Dr. Hall described Kishwar in her initial session as "casually dressed with good hygiene…cooperative…[with] a normal gait and [wearing] a neck brace." (Tr. 644). Dr. Hall diagnosed Kishwar with "Depressive Disorder and Anxiety Disorder relating to a medical condition Pain Disorder," but noted that she "appeared capable of managing benefit payments in her own interest and understand meaning filing for benefits." (Tr. 646-47).

The last year that Kishwar received medical treatment before her ALJ hearing was 2014. During this year, Kishwar began to receive treatments from Dr. Humaira Abid. (Tr. 649). On March 18, 2014, Kishwar was treated for a flair up in her Type II Diabetes. (Tr. 649). During the exam she received a full medical work up including tests on her back, neck, and elbow. (Tr. 649-63). The exam revealed there was limited range of motion in Kishwar's left elbow due to the previous fracture. (Tr. 663). However, other than the restricted range of motion, the exam showed no abnormality in Kishwar's extremities, back, or neck other than "mild" spondylosis. (*Id.*). In fact, Dr. Abid noted "no joint swelling or tenderness and a muscles strength rating of 4/5" in Kishwar's problem left hand, as well as a negative straight leg test and normal gait. (*Id.*). Kishwar was not treated again until a month later when she returned and was diagnosed Arthralgia and prescribed Tramadol and Naprosyn. (Tr. 803). During the appointment, Dr. Abid noted for the first time in the record that Kishwar was walking with the help of a cane. (Tr. 799). Nowhere in the record is there a prescription for the cane. Kishwar again complained of pain in her back and shoulder on May 29th. (Tr. 769).

Also, during this year, Kishwar was given a series of tests to determine the cause of her chronic pain. She was given a 24 hour monitoring tests for her hypertension which, according to the records, came back "normal." (700, 752-55). Next, she was given an MRI on her cervical spine which revealed that there was minor degeneration, but no major abnormalities. (Tr. 702). Finally, in December Kishwar was sent to LBJ to receive a clinical Pathology consult looking for Rheumatic disease or arthritis. (Tr. 836-47). Both exams concluded that these disorders were "unlikely…[with] the ANA result being weakly positive…[but] with additional tests with much

10

higher specificity for SLE were performed and produced negative results." (Tr. 836-47).

It was also during this period that Kishwar began to receive psychiatric treatment for depression, Post Traumatic Stress Disorder ("PTSD"), and general Anxiety. (Tr. 788, 778). The record indicates Kishwar sought treatment in April, and she was examined by Dr. Glenn Belz of the Squatty Lyons Clinic. (Tr. 788). Dr. Belz opined that Kishwar was suffering from Depression and "unspecified anxiety state." (Tr. 793). Dr. Belz then ordered Kishwar receive another psychological evaluation and follow up with a behavior therapist." (Tr. 793).  Kishwar returned to Dr. Belz for her psychological evaluation on May 12, where he determined she was suffering from recurrent depression and PTSD. (Tr. 778).  A few days later on May 19, Kishwar had an appointment with Dr. Anthony Jones, a behavioral psychologist. (Tr. 774). Dr. Jones diagnosed Kishwar with depression and PTSD. According to Dr. Jones's treatment notes, Kishwar was "talkative [and] engaged" and that she was "logical and rational" throughout the examination with "fair insight/judgement." (Tr. 777). Both doctors treated Kishwar for the rest of the year, and reported gradual improvements in her recovery. (Tr. 718, 727, 741,750,759).  For instance, Dr. Jones noted that Kishwar's "Thought process was goal oriented/linear…Insight/judgement [was] intact [,] Memory [was] intact…[and] attention span/concentration [was] intact." (Tr. 718).

Here, substantial evidence supports the ALJ's finding that Kishwar's status post back injury with resulting chronic back and neck radicular pain; degenerative disc disease; cervical and lumbar spine with right sided cervical radiculopathy; osteoarthritis in the left elbow; rotator cuff tendonitis; bilateral carpal tunnel syndrome; fibromyalgia; pain disorder; depression and anxiety related to her general medical condition were severe impairments at step two, and that such impairments at step three did  not meet a listed impairment.

In addition, substantial evidence supports the ALJ's finding that Kishwar retained the RFC to lift, carry, push or pull 20 pounds, occasionally and 10 pounds frequently; sit 6 hours in an 8 hour workday with normal breaks and a sit stand option every 30 minutes; and a walk 6 hours in an 8 hour work day with normal breaks and a sit/stand option every 30 minutes. Kishwar

was limited to work involving occasional reaching, gross handling, and fine fingering with the left dominant upper extremity. She was also limited to work performing detailed but not complex tasks with three or four step instructions in a supervised, low stress environment requiring few decisions. The ALJ's determination is consistent with the record as a whole. The ALJ gave specific reasons in support of the RFC determination. This factor weighs in favor of the ALJ's decision.

### B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. The law is clear that "a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with...other substantial evidence." *Newton*, 209 F.3d at 455. The ALJ may give little or no weight to a treating source's opinion, however, if good cause is shown. *Id.* at 455-56. The Fifth Circuit in *Newton* described good cause as where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *Id.* at 456. "[A]bsent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. The six factors that must be considered by the ALJ before giving less than controlling weight to the opinion of a treating source are: (1) the length of treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) the support of the source's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the source. 20 C.F.R. §404.1527(d)(2); *Newton*, 209 F.3d at 456. An ALJ does not have to consider the six factors "where there is competing first-hand medical evidence and the ALJ finds as a

factual matter that one doctor's opinion is more well-founded than another," and where the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical basis for a contrary opinion." *Newton*, 209 F.3d at 455; Alejandro v. Barnhart, 291 F.Supp.2d 497, 507-11(S.D. Tex. 2003). Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176. "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002)("It is well-established that we may only affirm the Commissioner's decision on the grounds which he is state for doing so."). However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that she carefully considered the medical records and testimony, and that her determination reflects those findings accurately. The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources. The ALJ's decision is a fair summary and characterization of the medical records. The Court concludes that the diagnosis and expert opinion factor also weighs in favor of the ALJ's decision.

### C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985). The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. §423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made by the individual or his

13

physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C §423. "Pain constitutes a disabling condition under the SSA only when it is "constant, unremitting, and wholly unresponsive to thereputic treatment." *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5th Cir. 1990)(citing *Farrell v. Bowen*, 837 F.2d 471,480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33,35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

Here, Kishwar testified about her health and its impact on her daily activities. She offered no testimony or corroboration from her family or friends with respect to her complaints about her condition. The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that she weighed the testimony improperly. Accordingly, this factor also supports the ALJ's decision

### D. Educational Background, Work History, and Present Age

The final element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Cheryl L. Swisher, a vocational expert ("VE"), at the hearing. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughn v. Shalala*, 58 F.3d 129,131 (5th Cir. 1995)(quoting *Fields v. Bowen*, 805 F.2d 1168,1170 (5th Cir. 1986)). It is well settled that a vocation expert's

14

testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431,436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling*, 36 F.3d at 436.

Kishwar argues that substantial evidence does not support the ALJ's step four finding that she could perform her past relevant work as a cashier as both generally and actually performed. According to Kishwar, the ALJ mischaracterized her past work as a cashier by ignoring the additional duties she performed. Kishwar described her job duties as follows: "I worked at the register/counter. I took orders, prepared them, and ran the cash register. I packed donut trays. I filled donut boxes, made coffee, cleaned dishes, mopped floor daily, sweeped [sic] floor, cleaned counters, greeted customers, cleaned/stocked shelves, cooked, cleaned tables, filled temp. logs, checked exp. dates on all food items, inventory checks." (Tr. 273). She denied doing her job duties while sitting. At the hearing, she testified that the job was an "eight hours a day standing job, no sitting." (Tr. 37). Kishwar argues that the job as a cashier at Dunkin' Donuts as actually performed was contrary to the ALJ's RFC, which limited her to work where she could stand and walk 6 hours in an 8-hour day and had a sit/stand option every 30 minutes. She further argues that because the RFC limited her to occasional reaching, handling, and fingering with the left upper extremity, she cannot perform the non-cashiering job duties such as cleaning, cooking, stocking, sweeping, and carrying trays. According to Kishwar, the totality of her job duties at the donut shop was akin to a "composite job" yet the VE only discussed the cashier function of her much broader job duties. In response, the Commissioner argues that substantial evidence supports the ALJ's step four determination that Kishwar could perform her past work as a cashier as actually and generally performed. The Commissioner argues that the burden at step four is on

15

Kishwar to rebut the determination that she could perform her past relevant work as a cashier and that she failed to meet her burden.

The law is well settled that at Step four, it is the claimant's burden to establish that she cannot perform her past relevant work. *See Legett* v. *Chater* 67 F.3d 558, 564 (5th Cir. 1995). In making this determination, the ALJ considers either (1) the job duties peculiar to an individual job as the claimant actually performed it, or (2) the functional demands and job duties of the occupation as generally required by employees throughout the national economy. *Social Security Ruling: Program Policy Statement Title II and XVI: Past Relevant Work–The Particular Job or The Occupation As Generally Performed,* SSR 82-61, 1982 WL 31387, at *1-2 (S.S.A. Nov. 30, 1981). The regulations further provide that an ALJ may consult a VE to determine the proper characterization of the claimant's prior work, and whether she can return to the past work as she actually performed it or whether she can perform the work as it is generally performed in the economy. In *Legett v. Chater*, the Fifth Circuit held that a claimant's inability to perform certain requirements of her past job does not mean that she is unable to perform "past relevant work" as that phrase is defined in the regulations. 67 F.3d 558, 564 (5th Cir. 1995).

Here, the ALJ wrote: "After discussing the claimant's vocational history, Ms. Swisher testified that the demands of the claimant's past relevant work as a cashier were within her residual functional capacity both as generally and actually performed (Hearing Testimony). In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I found that the claimant was able to perform it as actually and generally performed. Pursuant to SSR 00-4p, Ms. Swisher's testimony was consistent with the United States Labor Department's *Dictionary of Occupational Titles*." (Tr. 22-23). The VE did not testify that the cashier position/manager position was a composite job, and the totality of the VE's testimony shows that the only job duties considered were that of a cashier and not the duties that Kishwar assumed when she became a manager at Dunkin' Donuts. To the extent that Kishwar's testimony and work report submitted in connection with her disability applications shows that she actually

16

performed her job duties as a cashier standing, Kishwar did not question the apparent inconsistency between her RFC and the job as she actually performed it at Dunkin' Donuts. To the extent Kishwar disagreed with the VE's characterization of her prior work and discrepancies between her RFC and her prior work, she was obligated to raise the issue on cross-examination. *See Bryant v. Astrue*, No. 09-1499, 2010 WL 3541097, at *5 (W.D.La. July 30, 2010)(finding the ALJ complied with SSR July 30, 2010 ("[I]f plaintiff harbored any doubts concerning the VE's characterization of his prior work, plaintiff was obliged to emphasize the alleged inconsistency and to press the issue upon cross-examination."). Here, Kishwar failed to question the VE's characterization of her past relevant work, and the VE's testimony that her prior work was consistent with the RFC determination. A claimant's substantial rights are affected when, absent creditable explanation from the ALJ, the evidence and testimony otherwise compels a finding favorable to the claimant. *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). Here, Kishwar cannot show prejudice. The ALJ found that Kishwar could perform the job as generally performed, which would support her step four determination, and in the alternative, continued to step five.

Kishwar further argues that the ALJ erred at step five when she found that Kishwar had transferable skills to the following jobs: companion, appointment clerk, and receptionist based on the VE testimony that her past relevant work as a medical clerk gave transferable skills of medical terminology, blood work, scheduling, charting, and written documentation, and scheduling appointments. Kishwar argues that the ALJ's decision fails to adequately explain how her prior work as a medical assistant gave her the requisite skills to be a appointment clerk or receptionist. She further argues that the ALJ failed to inquire on the record about whether there were any conflicts between the occupational evidence and the DOT, and if there were conflicts, failed to obtain a reasonable explanation for any such conflict. Finally, Kishwar argues that based on her RFC, she cannot perform the job duties of a companion or as an appointment clerk because the Selected Duties for the jobs in the DOT provides that the jobs require frequent

17

handling and frequent reaching throughout the work day.  The Commissioner responds that substantial evidence supports the ALJ's step five determination.

Here, the ALJ relied on the VE's testimony that Kishwar acquired transferable work skills from her past relevant work as a medical assistant, and that based on her age, education, and RFC could perform work as a companion, appointment clerk, and receptionist.  The VE testified about the type of skills acquired by Kishwar as a medical assistant that were transferrable such as knowledge of medical terminology, blood work, scheduling, charting, and written documentation. The ALJ questioned the VE as follows at the hearing about the transferability of skills.

> Q.  Ms. Swisher, the claimant described work as a cashier at the donut shop and also worked as a medical assistant at the doctor's office. Can you help us understand how the Dictionary of Occupational Titles classifies her work?
>
> A.  Certainly.  She worked as a cashier.  DOT code is 211.462-010.  This is a light exertional level position.  It is unskilled at SVP two.  She also worked as a medical assistant.  This is DOT code is 079.362-010.  This is a light exertional level position. It is skilled, SVP six.
>
> Q.  Are there any transferrable skills to other jobs?
>
> A.  Yes, Your Honor.  Some of the transferrable skills to other jobs?
>
> A.  Yes, Your Honor. Some of the transferrable skills are knowledge of medical terminology. She could perform medical coding. She also performed patient care. Took vital signs. Provided–she also performed blood tests and shots.
>
> She scheduled patient's appointments.  She charted information regarding the patients in charts. She provided–I believe she also did some supervisory work of two interns in her job as a medical assistant.
>
> Q. Assume with me that we have a person closely approaching advanced age alleged onset, with the advanced education and past work experience that you had identified. Assume that the person is capable of performing the exertional demands of the wide range of light work, as defined by the Social Security regulations.
>
> Assume that the person can lift, carry, push and pull 20 pounds occasionally, 10 pounds frequently and sit, stand or walk for a total of six hours a day each throughout the eight-hour workday.
>
> The hypothetical person would need a sit/stand option every 30 minutes, and would be limited to occasional reaching with the left upper extremity. Occasional handling with the left upper extremity and occasional fingering with the left upper extremity.
>
> The hypothetical person is right-hand dominant, and would be limited to performing detailed but not complex work of up to three to four-step instructions, in a

supervised, low stress environment, requiring few decisions. With these restrictions, would such a person be able to do any of the past relevant work?

A.  Let's see. No, Your honor. In terms of the medical assistant, that would be excluded. The cashier position, I believe would still be intact. That was an unskilled job, and since the person is right-hand dominant, I believe that would still be intact.

Q.  Okay.  Utilizing transferable skills, there would be any jobs available?

A.  Yes, Your Honor.  The following positions, would still be intact. The first position would [be] that of a companion. DOT code is 309.677.010. This is a light exertional level position. It is semiskilled, SVP three. There are approximately 3,000 positions in Houston and surrounding counties, and approximately 150,000 plus positions in the national economy.

And let me check on another position, Your Honor. I'm actually going to move down to sedentary, Your Honor, and so the following positions I believe would still be intact.

Under sedentary is that of an appointment clerk. DOT clode is 237.367-010. This is a sedentary exertional level position. It is semiskilled, SVP three. There are approximately 3,000 positions in the Houston and surrounding counties and approximately 170,000 positions in the national economy. Did you want any unskilled if I have some?

Q.  No. With the restrictions of a sit/stand option every 30 minutes, would the appointment clerk be available?

A.  I believe so. Yes, Your Honor. They have a lot of flexibility.

Q.  And what transferable skills are being utilized with these jobs?

A.  Well, with a companion of course I would say patient care is there, and then as far as scheduling appointments, she did some of that in her medical assistant work. You have to interact with the patient. She had the qualifications regarding that.

Q.  Would a receptionist job be responsive or is that unskilled?

A.  Actually, it is still available. It's DOT code 237.367-038.

Q.  I'm sorry? 038?

A.  Yes, ma'am.

Q.  Okay.

A.  It is sedentary. It is semiskilled, SVP four. There are approximately 11,000 positions in the Houston and surrounding counties, and approximately 500,000 positions in the national economy.

Q.  Would a receptionist position be available with a sit/stand option every 30 minutes?

A. Yes.

\*                        \*                        \*

Q. One other question, before Counsel asks you. The receptionist job, does that use the transferable skill of appointment scheduling?

A. Yes, it does.  Yes. I mean communication with the head of commerce [phonetic]. (Tr. 65-69).

In addition, the record shows that Kishwar's counsel was given the opportunity to cross-examine the VE.  (Tr. 69-75).  The VE was questioned extensively the transferability of skills, and as well as her ability to perform the jobs based on her RFC.

Q. In terms of the vocational adjustment to the sedentary jobs, would there be very little, if any, vocational adjustment? More than very little, if any?

A. She–the category that we're dealing with is the closely approaching, but–so you are asking me to–

Q. That applies once she's 55.

A. Exactly.  So the adjustment issue doesn't come into play until she's 55.

Q. Right.  So, I'm asking it then from that–

A. From that angle?

Q. —angle.

A.  Okay.  I do consider all of that and the claimant is so well educated and so experienced.  I do not believe there would be very much.  So, I believe—I just don't believe there would be much adjustment at all just because she has so much education, as well as her experience, and the positions I gave were lower you know in skill level than the medical assistant position.

Q. But what about the receptionist job generally?  The numbers you gave for that receptionist job is just in the medical field or is that just —

A. No.

Q. —general?

A. That's general.  Just general.

Q. Well, there would be —

A. Does she —

20

Q. There's some more significant vocational adjustment let's say if she went to work or tried to work at a law office or do something different than medical office, right?

A.  Well, no.  Answering the phone is answering the phone.  Just the–in this particular case, there may be very little vocational adjustment, but she's just a highly educated, skilled person.  That's what I consider.

Q.  That's even taking into account that her education is from a different country?

                    *                    *              *

 A.  I didn't know her education was in a different country.

Q.  It was in Pakistan.
                    *                    *              *
Q (from the ALJ)  Ma'am, did you stay in American for your certified medical assistant?

A.  Yes.

Q (from the ALJ)  You have a certificate in that area?

A.  Yes.

                    *                    *                    *

Q.  If the individual had to lie down or recline for let's say more than an hour and a half out of an eight-hour workday on a daily basis, due to the pain and other symptoms, would there be any work they could do with those sorts of limitations, past or other?

A.  No.

Q.  If the individual, due to pain symptoms and depression, was unable to sustain concentration levels beyond simple repetitive instructions, she wouldn't be able to use the transferrable—

A.  That's correct.

Q.  — skills, correct?

A.  Right.

Q.  And then it would be an issue of whether the unskilled work would apply.

A.  Especially at the sedentary level.  Yes.  Because we're still dealing with the closely.  Is that the –maybe closely approaching advanced age.
Q.  I want to clarify one other point about the original hypothetical, which was that the work would be, and correct me if I'm interpreting this wrong, you said supervised, low stress work?  Is that the way the hypothetical was or–

A.  Yes.

21

Q.  Okay.  Now, like a companion, is that supervised?  I mean how is that supervised?  You go out on your own.

A.  Right.  But the employer is the patient, and you're with the patient.

Q.  But they're–

A.  Well, the employer may be the agency, right?

Q.  That's most of a customer then.  I mean supervision I think of –

A.  Yes, but–

Q.  – what your boss is instructing you to do.

A.  Right.  But it's also low stress, but the patient–sometimes the patient is and they're — they don't do a good job they're reporting to the employer.  So, it more dual like there, because what if they start on the job?  Wouldn't the patient let the agency know?  So, that why I included it.  I'm just giving you my rationale.  That I felt like it was still intact.

Q.  Okay.  But it's not a kind of job where you actually have a supervisor there to instruct you what to do?

A.  Well, it is a special job.  Any job that you're working at home, in a home environment, someone is– you know it's – you don't have a traditional setting of having a supervisor that you can think–like you probably think of, but that patient you know can certainly report you and [inaudible].

                    *                    *                    *

Q.  The other question then at the sedentary level if basically the occasional use of the left, nondominant arm and hand, that doesn't affect the ability to perform the jobs you indicated, right?

A.  Right.

Q.  At an unskilled level, that would tend to have a more major–

A.  That's right.  yes.

Q.  If you had that sort of limitation at unskilled, it really wouldn't be significant.

A.  Yes.

Q.  Would it ordinarily?

A.  That huge impact.

Q. And one last question. If the individual had exacerbations of pain symptoms and would miss work three or more times month on an ongoing basis, would that be consistent with any employment?

A. In my opinion, that would not be consistent with any form of employment. (Tr. 69-75).

A claimants skills are transferable when the "skilled or semi-skilled work activities that he has done in the past can be used to meet the requirements of skilled or semiskilled work activities of other jobs or kinds of work." *See* 20 C.F.R. § 404.1568(d)(1), 416.986(c), SSR 82-41, 1982 WL 31389. Transferable skills "is most probable or meaningful with jobs where the same of lesser degree or skill is required because people are not expected to do more complex work than they have previously performed." *Rivera v. Astrue*, No. 6:08-C-075-C, 2010 WL 711717, at *4 (N.D. Tex. Mar. 2, 2010). The transferability of skills depends largely on the similarity of occupationally significant work activities among the different jobs. *Jeffcoat v. Sec'y of Health & Human Servs.*, 910 F.Supp. 1187, 1194 (E.D. Tex. 1995). Pursuant to SSR 82-41, when a claimant is found to have transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the ALJ's decision.

Here, the ALJ's decision shows that she included such findings in her decision. The ALJ relied on the VE's testimony that plaintiff acquired transferrable skills which were within her RFC, and which transferred to other jobs that exist in significant numbers in the regional and national economy. The ALJ wrote:

Ms. Swisher was asked if any occupations existed which could be performed by an individual with the same age, education, past relevant work experience, and residual functional capacity as the claimant, and which required skills acquired in the claimant's past relevant work but no additional skills. [Ms. Swisher] responded and testified that representative occupations such an individual could perform included: **companion,** using the patient care skills acquired as a **medical assistant,** using transferable skills of knowledge of medical terminology, blood work, scheduling, charting, and written documentation, *DOT* 309.677-010, light and semi-skilled with an SVP of 3 and 3,000 jobs in the Greater Houston economy and 150,000 jobs in the national economy; **appointment clerk** using scheduling skills from the medical assistant position, *DOT* 237.367-010, which is sedentary and semi-skilled with [an] SVP of 3 and 3,000 jobs in Greater Houston and 170,000 nationally; and **receptionist** using appointment scheduling and patient interaction skills acquired as a medical assistant, *DOT* 237.367-038, sedentary and semi-skilled with [an] SVP of 4 and 11,000 jobs in Greater Houston and 500,000 nationally (Hearing Testimony).

23

> Ms. Swisher confirmed that the positions were consistent with a sit/stand option every 30 minutes and required almost no vocational adjustment, as the jobs are essentially tasks the claimant was already performing as a medical assistant except that she would not have been performing the number of tasks encompassed in the medical assistant position.
>
> Pursuant to SSR 00-4p, I determined that Ms. Swisher's testimony was consistent with the information contained in the *Dictionary of Occupational Titles.* (Tr. 23-24)(emphasis in original).

Moreover, the law is clear that "claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000). Thus Kishwar's reliance on the Selected Duties for the jobs is misplaced given that the VE testified that occasional use of the left, nondominant arm and hand would not affect the ability to perform the jobs of companion, appointment clerk, and receptionist (Tr. 75), and given that there was no adversarial development at the hearing concerning the RFC's limiting Kishwar to occasional reaching, handling, and fingering with the left upper extremity and the jobs identified by the VE. (Tr. 69-75).

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert. A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Kishwar was not disabled. Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Kishwar could perform work as a companion, an appointment clerk, and a receptionist. The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the record evidence, constitutes substantial evidence to support the ALJ's conclusion that Kishwar was not disabled within the meaning of the Act and therefore was

not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

## V. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Kishwar was not disabled within the meaning of the Act, that substantial evidence supports the ALL's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No. 14), is DENIED, Defendant's Motion for Summary Judgment (Document No. 12) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this _3rd_ day of _August_____ , 2016

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE